RACING ASSOCIATION OF CENTRAL IOWA, Iowa Greyhound Association, Dubuque Racing Association, Ltd., and Iowa West Racing Association, Appellants,

v.

Michael FITZGERALD, Treasurer, State of Iowa, Appellee.

No. 01–0011.

Supreme Court of Iowa.

Feb. 3, 2004.

Mark McCormick, Thomas L. Flynn, and Edward M. Mansfield of Belin Lamson McCormick Zumbach Flynn, a Professional Corporation, Des Moines, for appellant Racing Association of Central Iowa.

Gerald Crawford and Brad Schroeder of The Crawford Law Firm, Des Moines, for appellant Iowa Greyhound Association.

Stephen C. Krumpe of O'Connor & Thomas, P.C., Dubuque, for appellant Dubuque Racing Association, Ltd.

Lawrence P. McLellan of Sullivan & Ward, P.C., Des Moines, for appellant Iowa West Racing Association.

Thomas J. Miller, Attorney General, and Jeffrey D. Farrell and Jean M. Davis, Assistant Attorneys General, for appellee.

TERNUS, Justice.

When this case was initially before our court, we held that a statute taxing gross gambling receipts generated at racetracks at a rate nearly twice the rate imposed on gross gambling receipts generated on riverboats violated the United States Constitution and the Iowa Constitution. *See Racing Ass'n v. Fitzgerald,* 648 N.W.2d 555, 562 (Iowa 2002) (reversing district court's summary judgment for the State) [hereinafter *"RACI"*]. On certiorari to the United States Supreme Court, that part of our decision holding the statute violated the Equal Protection Clause of the United States Constitution was reversed. *See Fitzgerald v. Racing Ass'n,* 539 U.S. 103, ——, 123 S.Ct. 2156, 2161, 156 L.Ed.2d 97, 105 (2003). The Supreme Court then remanded the case "for further proceedings not inconsistent with [its] opinion." *Id.* Although this court's ruling that the statute also violated the equality provision contained in the Iowa Constitution was not reviewed by the Supreme Court, *id.* at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 102, we take the opportunity on remand to reconsider our prior decision on the state constitution claim in light of the Court's ruling on the federal constitution issue.

After giving due consideration to the Court's analysis and decision, we find no basis to change our earlier opinion that the differential tax violates article I, section 6 of the Iowa Constitution. Therefore, we reverse the trial court's contrary ruling and remand this case for a determination of the appropriate relief.

I. *Review of Pertinent Background Facts and Proceedings.*

This action was commenced by the appellant, Racing Association of Central Iowa (RACI), to enjoin the collection of that portion of taxes it was required to pay on adjusted gross receipts from gambling in excess of the tax charged to "excursion boats" on such receipts. *See generally* 1989 Iowa Acts ch. 67 (authorizing gambling on "excursion boats"). RACI claimed the tax was unconstitutional under the Equal Protection Clauses of the United States and Iowa Constitutions.

RACI operates a pari-mutuel horse racetrack and casino known as Prairie Meadows Racetrack and Casino in Altoona, Iowa. Appellant, Dubuque Racing Association, Ltd., which intervened in RACI's

lawsuit, operates a pari-mutuel dog racetrack and casino known as Dubuque Greyhound Park and Casino in Dubuque, Iowa. Another intervenor, appellant Iowa West Racing Association, holds the gaming license and owns the slot machines for Bluffs Run Racetrack and Casino in Council Bluffs, Iowa. The fourth appellant, Iowa Greyhound Association, intervened to protect the interests of its members, greyhound owners who race at the Dubuque and Council Bluffs dog tracks.

The tax statute challenged by these parties is Iowa Code section 99F.11 (1999), which imposes a tax "on the adjusted gross receipts received annually from gambling games." The maximum rate is twenty percent. *See* Iowa Code § 99F.11. The statute has an exception, however, for the "adjusted gross receipts ... from gambling games at racetrack enclosures." *Id.* The tax rate on racetrack gambling receipts began at twenty-two percent in 1997, and has automatically increased by two percent each year to a maximum rate of thirty-six percent in 2004. *See id.*

In our first consideration of this case, we held this differential tax violated the Equal Protection Clause of the United States Constitution and article I, section 6 of the Iowa Constitution. *See RACI*, 648 N.W.2d at 562.[1] As already mentioned, the United States Supreme Court reversed our decision to the extent it rested on federal constitutional grounds. *See Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2161, 156 L.Ed.2d at 105. It did not, however, consider the legality of the differential tax rates under the Iowa Constitution. Thus, the case was remanded "for further pro-

ceedings not inconsistent with [the Court's] opinion." *Id.*

Notwithstanding the fact the Supreme Court did not discuss the validity of the statute under the Iowa Constitution, we find it appropriate to reconsider our ruling on the state constitution claim since our court applied the federal rational basis test in determining whether the tax violated the Iowa Constitution. *See RACI*, 648 N.W.2d at 558. Thus, we again address, in light of the Court's certiorari ruling on the federal claim, whether section 99F.11 violates the Iowa equality provision. *See generally Chicago & N.W. Ry. v. Fachman*, 255 Iowa 989, 996, 125 N.W.2d 210, 214 (1963) (labeling article I, section 6 of the Iowa Constitution the " 'equality' provision"); *Sperry & Hutchinson Co. v. Hoegh*, 246 Iowa 9, 19, 65 N.W.2d 410, 416 (1954) (same). Before doing so, however, we consider the effect of the Court's decision on our analysis.

II. *Import of Supreme Court's Decision that Statute Did Not Violate the Equal Protection Clause of the United States Constitution.*

■ It is this court's constitutional obligation as the highest court of this sovereign state to determine whether the challenged classification violates Iowa's constitutional equality provision. *Callender v. Skiles*, 591 N.W.2d 182, 187 (Iowa 1999) (noting that while "we have deemed the federal and state ... equal protection clauses to be identical in scope, import, and purpose[,] ... it is the exclusive prerogative of our court to determine the constitutionality of Iowa statutes challenged under our own constitution");

---

1.  The United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14. In contrast, article I, section 6 of the Iowa Constitution states: "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

*Bierkamp v. Rogers*, 293 N.W.2d 577, 581 (Iowa 1980) (noting that notwithstanding Supreme Court decision on issue, "[i]t is our constitutional obligation to determine whether the classifications drawn . . . are violative of Article I, section 6, of our Constitution"); *see* William H. Rehnquist, *The Supreme Court: How It was, How It Is* 172 (1987) (stating "the question of the meaning of the Iowa Constitution is preeminently a question to be decided by the Supreme Court of Iowa, and not by some other court"); Robert F. Williams, *Equality Guarantees in State Constitutional Law*, 63 Tex. L.Rev. 1195, 1197 (1985) ("When faced with state constitutional equality claims, state courts should recognize their obligation to take these provisions seriously.") [hereinafter "*State Equality Guarantees*"]. While the Supreme Court's judgment on the constitutionality of Iowa's disparate tax rates under the federal Equal Protection Clause is persuasive, it is not binding on this court as we evaluate this law under the Iowa Constitution. *See Callender*, 591 N.W.2d at 187; *Bierkamp*, 293 N.W.2d at 579.

Two methodologies have been identified for an independent analysis of state equal protection claims: "Under the first, the state court adopts the federal frame of analysis but applies those constructs independently. Under the second, courts reject the federal constructs and apply their own analytical frameworks." *State Equality Guarantees*, 63 Tex. L.Rev. at 1219 (footnote omitted). In determining the proper analysis here, it is appropriate to consider both methodologies.

A. *Independent analysis.* We begin with the second approach—applying an in-dependently crafted analysis. Notwithstanding the broad statement made by this court in its initial opinion that we will apply the same analysis under the state equal protection provision as is applied under the federal Equal Protection Clause, this court has always reserved to itself the ability to employ a different analytical framework under state constitutional provisions. *See, e.g., Bowers v. Polk County Bd. of Supervisors*, 638 N.W.2d 682, 689 (Iowa 2002) ("We *usually* deem the federal and state equal protection clauses to be identical in scope, import, and purpose." (Emphasis added.)); *In re Interest of C.P.*, 569 N.W.2d 810, 811 (Iowa 1997) ("*Typically*, we deem the federal and state due process and equal protection clauses to be identical in scope, import, and purpose." (Emphasis added.)); *Krull v. Thermogas Co.*, 522 N.W.2d 607, 614 (Iowa 1994) ("In equal protection challenges based on the federal and Iowa Constitutions, we *usually* interpret both federal and state equal protection provisions the same." (Emphasis added.)); *Exira Cmty. Sch. Dist. v. State*, 512 N.W.2d 787, 792–93 (Iowa 1994) ("We *usually* deem the federal and state due process and equal protection clauses to be identical in scope, import, and purpose." (Emphasis added.)). The implication of these cases is that while we will generally apply the same analysis to federal and state equal protection claims, this court has not foreclosed the possibility that there may be situations where differences in the scope, import, or purpose of the two provisions warrant divergent analyses. *See generally State Equality Provisions*, 63 Tex. L.Rev. at 1207–08 (noting the distinction between federal equal protection and "Jacksonian [e]quality [p]rovisions").[2]

---

2. This author suggests there are "significant differences" between federal equal protection and Jacksonian equality provisions "in text, origin and focus." *State Equality Provisions*, 63 Tex. L.Rev. at 1207–08. He notes that equality provisions were included in state constitutions "after a series of abuses by the relatively unfettered state legislatures re-

Despite this court's right to fashion its own test for examining claims brought under our state constitution, we do not think *this case* is the proper forum to consider an analysis that might be more compatible with Iowa's constitutional language. We decline to do so here because the racetracks did not propose in their initial briefing that the test to be applied to their claim under the Iowa Constitution was any different than that applied under the federal Equal Protection Clause. Therefore, it is prudent to delay any consideration of whether a different analysis is appropriate to a case in which this issue was thoroughly briefed and explored. *See In re Detention of Garren*, 620 N.W.2d 275, 280 n. 1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant "ha[d] suggested no legal deficiency in the federal principles ..., nor ha[d] he offered an alternative test or guidelines").

B. *Independent application of federal test.* That brings us to the alternative manner in which this court might exercise its obligation to rule upon the state constitutional claim: by applying federal principles independently. This approach is nothing new. As noted above, this court ruled many years ago that federal decisions are persuasive, but not binding, on this court in its consideration of claims based on the Iowa Constitution. *See Bierkamp*, 293 N.W.2d at 579; *accord State v. Cline*, 617 N.W.2d 277, 283 (Iowa 2000) (refusing to adopt federal good faith exception to exclusionary rule for searches that violate Iowa constitution), *overruled in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n. 2 (Iowa 2001). It follows, then, that this court's independent application of the rational basis test might

result in a dissimilar outcome from that reached by the Supreme Court in considering the federal constitutional claim. *See State Equality Guarantees*, 63 Tex. L.Rev. at 1219 ("Courts that apply the federal constructs independently ... often reach results that directly conflict with those reached by the federal courts."); William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 500 (1977) ("[E]xamples abound where state courts have independently considered the merits of constitutional arguments and declined to follow opinions of the United States Supreme Court they find unconvincing, even where the state and federal constitutions are similarly or identically phrased.") [hereinafter "Brennan"]. This result is particularly possible in view of "the ill-defined parameters of the equal protection clause." *Miller v. Boone County Hosp.*, 394 N.W.2d 776, 781 (Iowa 1986); *see also Chicago & N.W. Ry.*, 255 Iowa at 996, 125 N.W.2d at 214 (noting, in considering state and federal equal protection claims, "[w]hile the general rules applicable in such cases seem pretty well settled, as is so often the case the difficulty arises in their application").

Our court's decision in *Bierkamp* illustrates this proposition. In *Bierkamp*, we acknowledged Iowa's guest statute did not violate the Equal Protection Clause of the Fourteenth Amendment in view of a United States Supreme Court decision upholding a similar statute against an equal protection challenge and the Court's more recent dismissal of a series of appeals on the same issue for want of a substantial federal question. 293 N.W.2d at 579. Notwithstanding the validity of the statute under the federal constitution, our court,

---

sponding to powerful economic interests." *Id.* at 1207. According to this writer, "[t]hey reflect the Jacksonian opposition to favoritism and special treatment for the powerful." *Id.*

He concludes an equality provision "does not seek equal protection of the laws at all. Instead, it prohibits legislative discrimination in favor of a minority." *Id.* at 1208.

applying the same analysis as that used by the Supreme Court, held the guest statute violated article I, section 6 of the Iowa Constitution. *Id.* at 582.

Based on our prior precedents and the sovereign nature of our state and its constitution, our court has an obligation to evaluate independently the validity—under the *Iowa* Constitution—of the differential tax rates imposed on excursion boats and racetracks. *See* Brennan, 90 Harv. L.Rev. at 502 ("[T]he decisions of the Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law."). When we independently consider this issue, we arrive at a conclusion different from that reached by the Supreme Court under the *federal* constitution.

### III. *Governing Legal Principles.*

██ We start our review of the challenged legislation with a statement of the governing principles of law. The Supreme Court has stated that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985); *accord Chicago & N.W. Ry.*, 255 Iowa at 1002, 125 N.W.2d at 217 ("All persons in like situations should stand equal before the law. No favoritism should be tolerated."). Whether this ideal has been met in the context of economic legislation is determined through application of the rational basis test. *See Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103. In its consideration of the case at hand, the Court described the rational basis test as follows:

"[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legisla-

tive facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."

*Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1, 13 (1992)). The Court has in the past more succinctly stated this standard as "whether the classifications drawn in a statute are reasonable in light of its purpose." *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222, 228 (1964); *accord College Area Renters & Landlord Ass'n v. City of San Diego*, 50 Cal.Rptr.2d 515, 520 (Ct.App.1996) ("Although equal protection does not demand that a statute apply equally to all persons, it does require that persons similarly situated *with respect to the legitimate purpose of the law* receive like treatment." (Original emphases omitted and emphasis added.)). It was this enunciation of the rational basis test that our court said in *Bierkamp* was appropriate for analyzing a claim based on the Iowa equality provision found in article I, section 6 of the Iowa Constitution. 293 N.W.2d at 580.

██ Based on these principles, this court must first determine whether the Iowa legislature had a valid reason to treat racetracks differently from riverboats when taxing the gambling revenue of these businesses. *See Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103 (requiring " 'a plausible policy reason for the classification' " (citation omitted)). In this regard, "the statute must serve a legitimate governmental interest." *Glowacki v. State Bd. of Med. Exam'rs*, 501 N.W.2d 539, 541 (Iowa 1993). Moreover, the claimed state interest must be *"realistically* conceivable." *Miller*, 394 N.W.2d at 779 (emphasis added).[3] Our court must

---

3. The requirement of " 'a *plausible* policy rea-son for the classification' " may be the aspect

then decide whether this reason has a basis in fact.[4] *See Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103 (requiring that legislature could rationally believe facts upon which classification was based are true). Finally, we must consider whether the relationship between the classification, i.e., the differences between racetracks and excursion boats, and the purpose of the classification is so weak that the classification must be viewed as arbitrary. *See id.* (requiring that " 'the relationship of the classification to its goal [not be] so attenuated as to render the distinction arbitrary or irrational' " (citation omitted)); *accord Chicago Title Ins. Co. v. Huff*, 256 N.W.2d 17, 29 (Iowa 1977) (requiring rational relationship between classification and a legitimate state purpose or governmental interest). This approach was followed by our court in *Federal Land Bank v. Arnold*, 426 N.W.2d 153 (Iowa 1988), where we said: "First we must examine the legitimacy of the end to be achieved; we then scrutinize the means used to achieve that end." 426 N.W.2d at 156.

■ Our examination of this statute must also be guided by the general legal principles that control a court's review of the constitutionality of a legislative enactment. These tenets are well established. "Statutes are cloaked with a strong presumption of constitutionality." *In re Detention of Morrow*, 616 N.W.2d 544, 547 (Iowa 2000); *accord Home Builders Ass'n v. City of West Des Moines*, 644 N.W.2d 339, 352 (Iowa 2002) ("Taxing statutes are presumed to be constitutional."). Therefore, a person challenging a statute shoulders a heavy burden of rebutting this presumption. *In re Detention of Morrow*, 616 N.W.2d at 547; *Glowacki*, 501 N.W.2d at 541. This burden includes the task of negating every reasonable basis that might support the disparate treatment. *Home Builders Ass'n*, 644 N.W.2d at 352. In summary, " '[a] statute must clearly, palpably, and without doubt infringe upon the constitution before we will declare it unconstitutional.' " *Glowacki*, 501 N.W.2d at 541 (citation omitted).

These rigorous standards have not, however, prevented this court from finding economic and social legislation in violation

---

of equal protection analysis most susceptible to differing conclusions in application. *See generally Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103 (emphasis added) (citation omitted) (stating requirements of Equal Protection Clause). The dictionary gives two synonyms for the word "plausible": "specious" and "credible." *Webster's Third New International Dictionary* 1736 (unabr. ed.2002). Certainly a "specious" reason should not pass constitutional muster. *See generally id.* at 2187 (defining "specious" in relevant part as "apparently right or proper: superficially fair, just or correct but not so in reality: appearing well at first view: PLAUSIBLE"). Rather, the policy reason justifying a particular classification should be "credible." *See generally id.* at 532 (defining "credible" as "capable of being credited or believed: worthy of belief ...: entitled to confidence: TRUSTWORTHY"). Our court's statement in *Miller* that the rea-

son offered in support of a classification must be *"realistically* conceivable" reflects the latter understanding of a "plausible" reason. 394 N.W.2d at 779 (emphasis added). It implicitly rejects a purely superficial analysis and implies that the court is permitted "to probe to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met." *Greenwalt v. Ram Restaurant Corp.*, 71 P.3d 717, 730–31 (Wyo.2003) (considering validity of statutory classification under the equal protection guarantees of the United States and Wyoming constitutions).

4. Although this element of equal protection analysis does not require "proof" in the traditional sense, it does indicate that the court will undertake some examination of the credibility of the asserted factual basis for the challenged classification rather than simply accepting it at face value.

of equal protection provisions. *See, e.g., Glowacki,* 501 N.W.2d at 541–42 (statute limiting stays of disciplinary orders issued by board of medical examiners); *Federal Land Bank,* 426 N.W.2d at 157–58 (redemption periods for property sold at foreclosure sale); *Miller,* 394 N.W.2d at 781 (notice requirement for claims against local government); *Bierkamp,* 293 N.W.2d at 585 (guest statute); *Gleason v. City of Davenport,* 275 N.W.2d 431, 435 (Iowa 1979) (notice requirement for claims against municipalities); *Chicago & N.W. Ry.,* 255 Iowa at 1004–05, 125 N.W.2d at 218–19 (wage payment statute); *Sperry & Hutchinson Co.,* 246 Iowa at 24–25, 65 N.W.2d at 419 (issuance of trading stamps by certain retailers). Our prior cases illustrate that, although the rational basis standard of review is admittedly deferential to legislative judgment, " 'it is not a toothless one' " in Iowa. *Mathews v. de Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389, 394 (1976) (citation omitted); *accord Fed. Land Bank,* 426 N.W.2d at 156 (recognizing the "deferential scrutiny" accorded the state "in the realm of economic policy and regulation," but stating that "even in the economic sphere, a citizen's guarantee of equal protection is violated if desirable legislative goals are achieved by the state through wholly arbitrary classifications or otherwise invidious discrimination"); *Bierkamp,* 293 N.W.2d at 581 (noting court's "considerable deference to the judgment of the legislature . . . is not, in and of itself, necessarily dispositive"). Indeed, this court's meaningful review of social and economic legislation is mandated by our constitutional obligation to safeguard constitutional values by ensuring *all* legislation complies with those values. *See Luse v. Wray,* 254 N.W.2d 324, 327 (Iowa 1977) (holding it is for the judicial branch to determine whether another branch of government has exceeded its constitutional limitations); *Davenport Water Co. v. Iowa State Commerce Co.,* 190 N.W.2d 583, 592 (Iowa 1971) ("[Q]uestions relative to constitutionality of legislation . . . stand as law issues determinable by the judiciary alone.").

We turn now to a consideration of the Iowa taxing scheme in light of these principles.

## IV. *Discussion.*

Although the State has advanced several reasons for the legislative classification challenged in this case, we focus our discussion primarily on those found satisfactory by the Supreme Court, as that is the reason for our reconsideration of the state constitutional claim. The Supreme Court viewed the issue as whether there was "rational support for the 20 percent/36 percent differential." *Fitzgerald,* 539 U.S. at ——, 123 S.Ct. at 2160, 156 L.Ed.2d at 104. It then concluded "[t]hat difference" was helpful to the riverboats because it (1) "encourage[d] the economic development of river communities [and] promote[d] riverboat history"; (2) "protect[ed] the reliance interests of riverboat operators" who were accustomed to a twenty percent tax rate; and (3) "aid[ed] the financial position of the riverboats." *Id.* We will address each suggested purpose separately.

■ A. *Economic development of river communities and promotion of riverboat history.* Our court does not accept the economic development of river communities and the promotion of riverboat history as a rational basis for the legislature's distinction between excursion boats and racetracks. Although these are laudable legislative goals, "the legislative facts on which the classification is apparently based [cannot] rationally [be] considered to be true by the governmental decisionmaker," as required by the Court's articulation of the rational basis test. *See id.* at ——, 123

S.Ct. at 2159, 156 L.Ed.2d at 103. We note initially that excursion boat gambling was never anticipated as solely a "river" activity so as to promote "river communities." When the legislature authorized gambling on "excursion boats" in 1989, it was envisioned that these boats would be located on inland waters, such as lakes and reservoirs, as well as on the Mississippi River and Missouri River, the historical location of riverboats. *See* 1989 Iowa Acts ch. 67, § 7(1) ("The commission shall decide the number, location and type of excursion gambling boats licensed under this chapter *for operation on the rivers, lakes, and reservoirs of this state.*" (Emphasis added.)) (codified at Iowa Code § 99F.7(1) (1991)); *id.* § 7(13) ("An excursion gambling boat *operated on inland waters of this state* shall meet all the requirements of chapter 106. . . ." (Emphasis added.)) (codified at Iowa Code § 99F.7(13) (1991)). Moreover, there is nothing peculiar about racetracks that prevents their location in river cities. In fact, two of the three communities in which racetracks are located—Dubuque and Council Bluffs—are river communities. *See generally Miller*, 394 N.W.2d at 779 (" 'For the purpose of ascertaining whether or not the classification is arbitrary and unreasonable, we must take into consideration matters of common knowledge and common report and the history of the times.' " (Citation omitted.)). The Dubuque racetrack is actually on an island in the Mississippi River. On the other hand, the excursion boat docked near Osceola, Iowa, is moored on a lake, not a river, and is certainly not located in a river community. In addition, one river community—Council Bluffs—has both a racetrack and an excursion boat, only blocks apart. So, to justify the differential tax treatment of these enterprises on the supposed connection of excursion boats to river communities and riverboat history

and the absence of such a connection by racetracks is illogical.

■ We acknowledge "the overinclusive-underinclusive dichotomy is usually applied only as part of a strict scrutiny analysis." *Bierkamp*, 293 N.W.2d at 584. But our court has stated, in holding legislation violative of the state constitution under the rational basis test, "that as a classification involves extreme degrees of overinclusion and underinclusion in relation to any particular goal, it cannot be said to reasonably further that goal." *Id.* That is precisely the case here insofar as the differential tax is based on the promotion of river communities and riverboat history. Thus, this legislative purpose cannot withstand review under the rational basis standard. *See Fed. Land Bank*, 426 N.W.2d at 157–58 (holding discrimination in redemption periods was equal protection violation where class membership did not correlate with purported class distinctions drawn by legislature); *Chicago & N.W. Ry.*, 255 Iowa at 997, 125 N.W.2d at 214 ("It is often said a reasonable classification is one which includes all who are similarly situated, and none who are not."); *Dunahoo v. Huber*, 185 Iowa 753, 756, 171 N.W. 123, 124 (1919) (finding statute violated state constitution because classification made by legislature was unwarranted "where the evil to be remedied relates to members of one class quite as well as to another"); *see also Ill. Sporting Goods Ass'n v. County of Cook*, 845 F.Supp. 582, 591 (N.D.Ill.1994) (holding ordinance that prohibited location of gun shop within .5 miles of a school or public park was "under-inclusive in violation of the equal protection clause" because the ordinance contained exceptions to the ban that permitted certain businesses to continue to sell guns within the restricted geographical area); *Callaway v. City of Edmond*, 791 P.2d 104, 107–08 (Okla.Crim.

App.1990) (finding state equal protection violation because ordinance prohibiting persons under eighteen years of age from entering any pool hall or similar establishment "sweeps too broadly" and "is not rationally related to the ultimate objective of regulating gambling": "Singling out poolhalls or other similar businesses from all other amusement establishments is an act of discrimination, not policy."); *State ex rel. Boan v. Richardson*, 198 W.Va. 545, 482 S.E.2d 162, 168 (W.Va.1996) (rejecting as legitimate basis for challenged classification that statute reducing workers' compensation benefits upon receipt of old age insurance benefits under Social Security Act avoided duplication of benefits because the statute did not "in fact avoid[ ] 'duplication of benefits' ").

■ Even if this court were to take a more expansive view of potential legislative purposes and assume the general assembly sought to promote economic development in general, the taxing scheme still suffers from an irrational classification. There is nothing in the record, nor is it a matter of common knowledge, that excursion boats are a superior economic development tool as compared to racetracks. To the contrary, it appears that both types of gambling enterprises have the potential to enhance the economic climate of the communities in which they are located. If we presume the legislature thought the promotion of gambling was in the economic interests of the general public, then we find no rational basis for distinguishing between gambling that takes place on a floating casino and gambling that occurs at a land-based casino. Regardless of the relative number of such establishments or the size of the city in which they are to be found, excursion boats and racetracks contribute in the same manner to the economy of the local area: they are both gambling enterprises generating gambling receipts that are indistinguishable in terms of the economic benefits to the local community. *See Arneson v. State*, 262 Mont. 269, 864 P.2d 1245, 1248–49 (Mont.1993) (holding statute violated equal protection clause of state constitution because the statutory classifications lacked a rational relationship to the asserted purpose of the legislation, noting "a classification must distinguish one class from another taking into consideration the purpose of the statute").

B. *Reliance interests of riverboat operators.* We also find insufficient the suggestion that excursion boat operators had a reliance interest on a lower tax rate so as to justify their different treatment. The taxation lines are not drawn on the basis of *when* the affected gambling establishments first invested in slot machines or in their business. Rather, the taxation lines are drawn on the basis of *where* the slot machines are located, regardless of the time of investment.

We found a similar flaw in the statute challenged in our *Federal Land Bank* decision. In that case, a statute established different redemption periods after foreclosure based on the identity of the *purchaser* at the foreclosure sale. *Fed. Land Bank*, 426 N.W.2d at 155. If the property was purchased by a "member institution" (a lending institution belonging to the federal deposit insurance corporation, the federal savings and loan insurance corporation, or the national credit union administration), the redemption period was one year; in all other cases, the property could be redeemed within two years of the sale. *Id.* One asserted basis for this distinction was that non-member *lenders* did not have a stake in the community and would not have the incentive to make arrangements with the landowner to enable the owner to retain the homestead; a longer redemption period presumably supplied this incentive. *Id.* at 157. We rejected the concerns of

mortgage *lenders* as a legitimate rationale for setting different redemption periods in the statute, however, noting "the distinction in redemption periods is triggered by the identity of the sheriff's sale *purchaser*, not the status of the institution or individual extending credit in the first instance." *Id.* (emphasis added).

■ Similarly, here, the statute cannot be sustained on the basis of concerns that established businesses relied on the lower tax rates, because the differential tax is triggered not by whether the business engaged in gambling prior to the implementation of the new tax rates, but on whether the gambling takes place on a floating casino. Thus, this legislative purpose fails the rational basis test because the relationship of the classification to its goal is so attenuated as to render the distinction irrational. *See id.; see also Coalition Advocating Legal Hous. Options v. City of Santa Monica,* 88 Cal.App.4th 451, 105 Cal.Rptr.2d 802, 809 (Ct.App.2001) (holding restriction on occupancy of second residential unit to relatives or caretakers of residents of primary unit did not bear a rational relationship to legitimate legislative goal of minimizing population and traffic in residential districts); *Ocala Breeders' Sales Co. v. Fla. Gaming Ctrs., Inc.,* 731 So.2d 21, 27 (Fla.Dist.Ct.App. 1999) (finding equal protection violation where statute required prospective licensee for pari-mutuel betting to hold a permit to race quarter horses, holding there was no rational relationship between this requirement and "'the public purpose of benefiting thoroughbred horse breeding sales and related economic activities'"); *DeCoste v. City of Wahoo,* 255 Neb. 266, 583 N.W.2d 595, 602 (1998) (striking down ordinance imposing landfill management fees only on residences or businesses with an individual electric meter because this classification did "not bear any relation-ship to the city's objective of raising revenue for closing the city landfill in compliance with federal and state guidelines"); *State v. LaPorte,* 134 N.H. 73, 587 A.2d 1237, 1239 (1991) (holding statute barring depositions of witnesses who were under the age of sixteen *at the time of alleged sexual offense* had no rational relationship to goal of protecting children under the age of sixteen from the trauma of being questioned because it denied defendant the opportunity to depose witness who was over the age of sixteen *at time of deposition); cf. Nordlinger,* 505 U.S. at 13–14, 112 S.Ct. at 2333, 120 L.Ed.2d at 14–15 (upholding California property tax system that limited annual increases in assessed valuation unless there was new construction or a change of ownership as legitimately protecting the reliance interests of existing owners).

■ C. *Assisting financial position of riverboats.* That brings us to the last reason upon which the Court relied to sustain the challenged legislation: the legislature wanted to aid "the financial position of the riverboats." *Fitzgerald,* 539 U.S. at ——, 123 S.Ct. at 2160, 156 L.Ed.2d at 104. While one can hardly dispute that being taxed at twenty percent puts a business in a better financial position than if it were taxed at thirty-six percent, one must still consider whether there is a relationship between this purpose and the classification that makes it reasonable to distinguish between excursion boats and racetracks. *See id.* at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103 (requiring, in addition to a credible legislative objective, that "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational"); *accord Fed. Land Bank,* 426 N.W.2d at 156–57 ("The question is whether these legitimate goals are rationally served by [the] legislative scheme. . . .");

*Chicago & N.W. Ry.*, 255 Iowa at 1002, 125 N.W.2d at 217 ("There must be some substantial distinction *having reference to the subject matter of the proposed legislation*, between the objects or places embraced in such legislation and the objects and places excluded." (Emphasis added.)); *Dunahoo*, 185 Iowa at 756, 171 N.W. at 123 (stating "the distinction in dividing must not be arbitrary, and must be based on differences which are apparent and reasonable"). If this were not so, then *any* differential tax would be constitutional because a lower tax *always* benefits the financial situation of the taxpayer subject to the lower rate.[5] Obviously more is required: there must be some reasonable distinction between excursion boats and racetracks that justifies taxing gambling revenue earned at such establishments dif-

ferently.[6] *See Fitzgerald,* 539 U.S. at ——, 123 S.Ct. at 2161, 156 L.Ed.2d at 105 (requiring rational relationship between classification and legislative goal).

In determining whether an adequate relationship exists between the classification and the legislative goal, we examine "the rationale advanced ... to justify th[e] class distinction." *Fed. Land Bank,* 426 N.W.2d at 157. The rationale here has always been that riverboats are different from racetracks and therefore gambling receipts earned on a riverboat can constitutionally be taxed differently than gambling receipts earned at a racetrack. But how are these enterprises different? "[S]omething more tangible than a mere name, business, or purpose of a corporation is exacted by the courts as a basis of classification." *Chicago & N.W. Ry.*, 255

---

5. The Supreme Court's reliance on this rationale to uphold the differential tax statute appears consistent with the observation made by one commentator who suggested the Court's decision in this case "serves as a useful reminder that federal equal protection challenges to state tax statutes are likely to fail unless the tax classification involves a protected class or discrimination against out-of-state taxpayers." *U.S. Supreme Court Update,* 13 J. Multistate Tax'n & Incentives (RIA) 42 (September 2003) (commenting on Court's decision in *Fitzgerald); see also* 3 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law* § 18.3, at 222–23 (3d ed.1999) (stating Supreme Court uses rational basis test "when it finds no basis for giving truly independent examination to a governmental classification"). Another writer has observed that equal protection challenges to state taxation laws and business regulations are "dismissed out of hand" by federal courts, in part due to federal restraint with respect to state matters. Lawrence Gene Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms,* 91 Harv. L.Rev. 1212, 1216 (1978). This author writes:

> Institutional rather than analytical reasons appear to have prompted the broad exclusion of state tax and regulatory measures from the reach of the equal protection con-

struct fashioned by the federal judiciary. This is what creates the disparity between this construct and a true conception of equal protection, and thus substantiates the claim that equal protection is an underenforced constitutional norm.

*Id.* at 1218; see also Brennan, 90 Harv. L.Rev. at 503 ("With federal scrutiny diminished, state courts must respond by increasing their own.").

6. We find little guidance from the Court on this aspect of the rational basis analysis, "the relationship of the classification to its goal," as the Court simply concluded without elaboration that such a " 'relationship ... is not so attenuated as to render the distinction arbitrary or irrational.' " *See Fitzgerald,* 539 U.S. at ——, 123 S.Ct. at 2161, 156 L.Ed.2d at 105 (citation omitted). Having no explanation of or justification for this conclusion, we give it little weight in considering compliance with the Iowa Constitution. *See* Brennan, 90 Harv. L.Rev. at 502 (stating "state court judges ... do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees").

Iowa at 999, 125 N.W.2d at 216; *cf. Gleason*, 275 N.W.2d at 435 ("In the absence of a rational basis for distinction, all municipalities in Iowa constitute a class upon which the law should operate in a uniform manner regarding civil liability."). Certainly the financial needs of excursion boats cannot be a basis for distinction because both industries "were losing significant revenue" when the challenged legislation was enacted. *RACI*, 648 N.W.2d at 557; *see Chicago & N.W. Ry.*, 255 Iowa at 998, 125 N.W.2d at 215 ("Where ... the economic benefits to be realized ... relates to members of one class quite as well as to another, such a classification would be unwarranted.").

Nor do we find it plausible that the legislature had a realistic expectation in 1994 that racetracks would be financially able to pay radically higher taxes based on the same amount of revenue than excursion boats would be able to pay. As noted, both types of establishments were losing money prior to the legislative action taken in 1994. Accordingly, the legislature addressed this problem by significantly expanding gambling *at both enterprises.* The addition of slot machines at racetracks in 1994 was clearly intended to enhance the profitability of the tracks, but favorable concessions were made in the same legislation for excursion boats. The 1994 act removed prior limitations on wagering, eliminating the five dollar maximum wager per hand or play, as well as the two hundred dollar maximum loss per person during each "gambling excursion." *See* 1994 Iowa Acts ch. 1201, §§ 11, 19. In addition this legislation repealed the restriction that no more than thirty percent of an excursion boat could be used for gambling activity. *Id.* § 16. These changes suggest that the gambling receipts of racetracks *and* riverboats would likely increase significantly.

More importantly, we find nothing in the record or in our common knowledge supporting a conclusion that the legislature could have rationally believed that racetracks would be significantly more profitable than excursion boats. *See Fitzgerald*, 539 U.S. at ——, 123 S.Ct. at 2159, 156 L.Ed.2d at 103 (requiring " 'the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker' " (citation omitted)). In fact, the legislative history indicates otherwise. The legislative study committee that recommended the statutory changes enacted by the general assembly in 1994 suggested that "[b]ecause the land-based casinos could function with a lower operating cost, the state should receive ... *24 %* of adjusted gross revenues over three million." (Emphasis added.) The recommendation of a *four percent* tax differential does not support the *sixteen percent* differential that was adopted, a *four-fold increase*. The plaintiffs clearly met their burden to show there was no credible factual basis for the legislature to believe that the racetracks would be able to pay nearly twice the amount of taxes as the excursion boats on the same amount of revenue.

We return, then, to the requirement that the classification must relate "to the purpose of the law, which may be either the elimination of a public 'mischief' or the achievement of some positive public good." *Chicago & N.W. Ry.*, 255 Iowa at 997, 125 N.W.2d at 215; *accord Glowacki*, 501 N.W.2d at 541 (stating rational basis test requires "a legitimate governmental interest"); *see also Chicago Title Ins. Co.*, 256 N.W.2d at 29 (upholding statute because it prevented "invidious practices ... deemed inimical to the public interest"). The only public interest identified by the Court to justify treating excursion boats more favorably is the statement that riverboats promote river communities and riverboat

history and racetracks do not. But as we have already discussed, this assertion has no basis in fact.

A similar flaw exists in the public interest asserted by the State on appeal: maintaining riverboats in Iowa. While the State has argued the differential tax was designed as an incentive to keep the excursion boats located on the border rivers from moving to another state with a more favorable regulatory climate, the legislative history belies that argument. The legislative study committee, recognizing the adverse effect on excursion boats due to competition from other states, recommended that the legislature eliminate the betting limits on excursion boat gambling, remove the restriction on the amount of space on the boat that could be used for gambling, and modify the cruising requirements.[7] It did not recommend lowering the taxes imposed on the riverboats to make them more profitable. Moreover, the legislature could not reasonably have believed that taxing racetracks at thirty-six percent rather than at the twenty-four percent rate recommended by the committee would have any impact on the competitive position of the excursion boats vis-à-vis their out-of-state counterparts. There is simply no rational connection between this conceivable legislative purpose and the discriminatory tax rate imposed on the racetracks.

In the end, we return to the fact that the item taxed—gambling revenue—is identical. The higher tax rate is triggered by the location where such revenues are earned. Yet there is no legitimate purpose supported by fact that justifies treating one gambling enterprise differently than another based on where the gambling takes place, other than an arbitrary decision to favor excursion boats. *See Ill. Sporting Goods Ass'n*, 845 F.Supp. at 591 ("There is no rational reason to distinguish between a gun sold within .5 miles of a school or park by a person who owns the premises on which the gun shop is operated and a gun sold by a person who leases the premises on which a gun shop is operated. In both instances, guns will be sold near areas where children congregate and play."); *Indus. Claim Appeals Office v. Romero*, 912 P.2d 62, 69 (Colo.1996) (holding statute terminating workers' compensation benefits for permanently totally disabled claimants upon age sixty-five, but not for partially disabled workers, violated state and federal equal protection on basis that classification was irrational in relation to asserted purposes of legislation); *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 850 P.2d 773, 782 (1993) (finding statute allowing evidence of collateral source payments only when damages in excess of $150,000 are claimed in violation of state equal protection: "[W]here, as here, the only basis for the classification is to deny a benefit to one group for no purpose other than to discriminate against that group, the statutory classification is not only mathematically imprecise, it is without a rational basis and arbitrary."); *Flagship Ctr., Inc. v. City of New Orleans*, 587 So.2d 154, 157 (La.Ct.App.1991) (striking down city ordinance treating cable television bingo operators more favorably than bingo hall operators with respect to the frequency of bingo games, stating the city's favoring of cable facilities over hall facilities "does not rationally relate to achieving the [city's stated] interest"); *Nankin v. Village of Shorewood*, 245 Wis.2d 86, 630 N.W.2d 141, 154 (2001) (holding statute providing different proce-

---

**7.** The committee reported that the bet limits and loss limits were causing gamblers to fre-    quent Illinois riverboats.

dures to challenge property tax assessments depending on whether property was located in populous county unconstitutional: "We are unable to identify any difference in situation or circumstance between properties located in populous counties and properties located in other counties in the state that would necessitate different legislation for the classes in challenging their property assessment."). As one commentator has stated, "[e]ven under the rationality test, the legislature is not entitled to pick out a group it disfavors, declare that group to be different, and then impose a special tax burden on the disfavored group." 3 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law* § 18.3(*e* ), at 244 (3d ed.1999).

## V. *Conclusion and Disposition.*

■ Our decision today is a difficult one because we have great respect for the legislature. Notwithstanding our preference to defer to its judgment, we declare the differential tax at issue here invalid under the Iowa Constitution because we are convinced the classifications made in section 99F.11 lack a rational basis in the constitutional sense. Because we are keenly aware of the legislature's constitutional role to make decisions of a policy and political nature, we have not lightly undertaken today's decision. Nonetheless, "[o]ur obligation not to interfere with the legislature's right to pass laws is no higher than our obligation to protect the citizens from discriminatory class legislation violative of the constitutional guaranty of equality of all before the law." *Sperry & Hutchinson Co.*, 246 Iowa at 24, 65 N.W.2d at 419. Consequently, we decline the opportunity to alter our prior decision that the statutory exception to the twenty percent tax rate on gambling receipts violates article I, section 6 of the Iowa Constitution. We reverse the decision of the district court upholding the higher tax rate on racetracks under the Iowa Constitution and remand for further proceedings.

### REVERSED AND REMANDED.

All justices concur except CARTER, J., who dissents and CADY, J., who dissents separately.

CARTER, Justice (dissenting).

I dissent.

It is unfortunate that the court has squandered the opportunity to correct its prior decision in this case, which, for reasons pointed out by the Supreme Court, was completely outside the mainstream of equal-protection jurisprudence. That mainstream is accurately reflected in the following:

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961).

There are two very legitimate reasons why the legislature could justifiably tax the gross receipts of racetracks at a higher rate than those of the casinos. First, the legislature may have simply preferred casinos over racetracks as vehicles for public entertainment and sought to give them

more assistance than the racetracks for that very simple reason. That would have been an entirely proper decision for the legislature to make. The second reason for the distinction that the legislature drew was the very distinct possibility that some of the casinos, particularly those along the Mississippi River, would view an increased tax burden as a reason to move their operations to a friendlier taxing venue. That was a risk not presented by the racetracks, which were firmly attached to the Iowa soil and several of which enjoyed the vestiges of local ownership.

Contrary to the majority's assumption, casinos and racetracks are distinctly different types of gambling enterprise. The former provides a broad array of gaming activities in a place where gambling is the main event. The latter are places where horse races and dog races are run with pari-mutuel betting and slot machines as a side attraction. Based on these clear differences, the legislative decision to tax them differently may not be attacked on the grounds that, in fact, the taxing scheme adopted will not better promote economic development or state revenue enhancement than would be the case if the two types of gambling facilities were taxed at the same rate. The legislature could properly elect which horse to ride in the context of gaming activity, and its decision may not be challenged on the ground that it was mistaken.

In *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480, 485 (1959), the Supreme Court recognized that a state may tax certain corporations and not tax others in an effort to encourage the location of certain companies within the state. I see no reason why the same principle may not be applied in order to assure the retention of certain activities in this state. That is what the legislature was attempting to do in not increasing the taxes on the casinos while taxing the racetracks substantially more. This is the type of choice that legislators are elected to make and involves the type of policy-making that should be the province of the legislative branch of government. I would affirm the judgment of the district court upholding these tax statutes as enacted by the General Assembly.

CADY, Justice (dissenting).

I respectfully dissent. The doctrine of independent constitutional interpretation by state courts is a powerful and vital aspect of constitutional law.[8] Yet, it is not well suited for equal protection claims involving a rational basis analysis of taxation statutes, and is entirely inappropriate when it arises within the very same case in which the United States Supreme Court has decided the issue. Since this court applies the same tests and follows the same analysis as the Supreme Court in

8. State court activism in the interpretation of state constitutions is beneficial and should be encouraged. *See generally* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489 (1977) (providing the most influential discussion of the advantages of such an approach). Just as federal courts help guide state courts in the area of constitutional interpretation, state courts can also help guide federal courts.

Unfortunately, the majority effectively uses the doctrine of independent review as substantive authority for its conclusion in this case. It seizes on the doctrine only after the United State Supreme Court determined our initial consideration of the matter was flawed and uses it to justify a decision directly contrary to the Court. Yet, the doctrine exists as mere authority for an independent review of a claim under our state constitution. It does not alter the legal principles we share with the Court that clearly instruct that the tax statute at issue in this case is not unconstitutional.

equal protection claims involving taxation, a conflicting decision by this court within the context of the same case necessarily means this court finds the Supreme Court decision to be totally and completely irrational and renders it a nullity, or at least merely advisory. This unprecedented action by the majority in this case is offensive to the institutional integrity of our system of justice in this country and is disruptive to the essential balance of power between the judicial and legislative branches of government in this state. It forces me to part from my colleagues and to, regrettably, express my ardent disagreement.

The majority correctly recognizes that conflicting conclusions can occur when state courts independently apply constitutional principles to challenges of discriminatory statutes, including challenges based on equal protection. For sure, this court has a proud and storied history, dating back to our earliest decisions, of viewing our state constitution as protecting individual rights not recognized by federal courts. *See In the Matter of Ralph,* 1 Morris 1, 7 (Iowa 1839) ("When, in seeking to accomplish his object, [one] illegally restrains a human being of his liberty, it is proper that the laws, which should extend equal protection to [persons] of all colors and conditions, should exert their remedial purpose."). However, the doctrine of independent interpretation cannot be used to justify a decision that conflicts with the Supreme Court in every instance, especially in cases involving challenges to taxation statutes. Unlike other areas of constitutional law, the legislature enjoys its broadest discretion in the realm of social and economic legislation. Courts, without exception, apply a minimal standard of rationality that requires any challenged discriminatory classification to be wholly and totally arbitrary before it violates equal protection.

In the area of taxation, more than any other field, we recognize the legislature possesses the greatest freedom of classification. *Motor Club of Iowa v. Dep't of Transp.,* 265 N.W.2d 151, 154 (Iowa 1978); *Dickinson v. Porter,* 240 Iowa 393, 401, 35 N.W.2d 66, 72 (1948); *accord Madden v. Kentucky,* 309 U.S. 83, 87–88, 60 S.Ct. 406, 408, 84 L.Ed. 590, 593 (1940); *see also Williams v. Vermont,* 472 U.S. 14, 22–23, 105 S.Ct. 2465, 2471, 86 L.Ed.2d 11, 19 (1985). We give our greatest deference to the legislature in tax matters because taxation policy is recognized to be "peculiarly a legislative function, involving political give-and-take and an awareness of local conditions." *Metro. Sports Facilities Comm'n v. County of Hennepin,* 478 N.W.2d 487, 489 (Minn.1991). As noted by the Supreme Court:

> The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized.... [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies.... It has ... been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes....

No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex are-

na in which no perfect alternatives exist, the court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under [an equal protection analysis].

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40–41, 93 S.Ct. 1278, 1300–01, 36 L.Ed.2d 16, 47–48 (1973) (footnotes omitted) (quoting *Madden*, 309 U.S. at 87–88, 60 S.Ct. at 408, 84 L.Ed. at 593); *see also Motor Club of Iowa*, 265 N.W.2d at 154; *Dickinson*, 240 Iowa at 401, 35 N.W.2d at 72. Without question, an equal protection challenge to a taxation statute is an extremely unlikely area of conflict between courts in our modern day society.

Under both the Iowa and federal equal protection analysis, economic discrimination in statutes is permissible, as long as a rational reason exists between the purpose of the statute and the classification made by the statute. Thus, an equal protection analysis essentially comes down to a judicial determination whether an identified reason for the classification is rational. Under the limited standard of review for taxation statutes, it is difficult for two courts to reach different conclusions if each court conscientiously follows the same governing principles. In other words, in most instances of disagreement, one of the courts is failing to follow the proper analysis.

Our courts did not always follow this rational basis test in the area of tax and economic legislation. In the decades following the Civil War, the United States Supreme Court began to earnestly scruti-

nize allegations of economic discrimination under a substantive due process approach. *See* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* §§ 15.2, .3, at 578–95 (1999) [hereinafter Rotunda & Nowak] (discussing the development and entrenchment of substantive due process analysis between 1865 and 1936). This led to a nearly forty-year trend of judicial activism in the area of economic legislation that allowed courts to scrutinize the wisdom of economic statutes. The most widely recognized symbol of this activism was *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), a case which lends its name to this era.[9] In *Lochner*, the Supreme Court held that a state statute establishing maximum hours bakery employees could work interfered with the freedom to contract for employment. *Id.* at 64, 25 S.Ct. at 546, 49 L.Ed. at 944–45. The Court engaged in its own evaluation of the merits of the legislation and rejected the rationale offered by the state that the statute was justified as a means to protect the health and welfare of bakers. *See id.* at 56–63, 25 S.Ct. at 542–45, 49 L.Ed. at 941–44.

The retreat from this period of "unprincipled judicial control of social and economic legislation" began in the 1930s, and was complete by the end of that decade. 2 Rotunda & Nowak § 15.4, at 600 *see, e.g., United States v. Carolene Prods. Co.*, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234, 1241 (1938) ("[R]egulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless ... it is of such a character as to preclude the assumption that it rests upon

**9.** Reference to *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), is fitting in light of the generally accepted view that it constituted the nadir of Supreme Court oversight of the legislative process. *See* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 15.4, at 600 (1999) ("[T]he independent review of legisla-

tion during this period resulted in an unprincipled judicial control of social and economic legislation."). The majority's approach and resolution of this appeal echoes the Supreme Court's *Lochner*-era decisions. It must be left to posterity to determine whether the majority opinion will someday be viewed as we now view *Lochner*.

some rational basis within the knowledge and experience of the legislators." (Footnotes omitted.)). Some of our own prior cases reflect the *Lochner*-era approach. *See, e.g., State v. Logsdon,* 215 Iowa 1297, 1300, 248 N.W. 4, 5 (1933) (a license law that "needlessly interferes with lawful occupations" would be unconstitutional); *Bear v. City of Cedar Rapids,* 147 Iowa 341, 344, 126 N.W. 324, 326 (1910) (ordinance requiring milk dealers to apply to the city board of health for license challenged on substantive due process grounds). Notwithstanding, there is no question that our test today reflects the current federal equal protection analysis.

Today, a rational basis test continues to be employed that accords a presumption of constitutionality to economic legislation and a recognition of great deference to the legislative judgment involved in such legislation. *See Sperfslage v. Ames City Bd. of Review,* 480 N.W.2d 47, 49 (Iowa 1992); *Dickinson,* 240 Iowa at 398–99, 35 N.W.2d at 71; *see also City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511, 516–17 (1976). It requires the court to first resolve doubts in favor of the legislation, and to respect the acceptable give-and-take and imperfect justice inherent in tax legislation, as well as the fundamental legislative role in developing public policy and tax strategies to accomplish that policy.

> It is accepted jurisprudence that the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with [equal protection guarantees].

*City of New Orleans,* 427 U.S. at 303–04, 96 S.Ct. at 2517, 49 L.Ed.2d at 517 (citations omitted); *accord Sperfslage,* 480 N.W.2d at 49; *Motor Club of Iowa,* 265 N.W.2d at 154; *Dickinson,* 240 Iowa at 398–99, 35 N.W.2d at 71. The grave error committed by the majority is that it steps back one hundred years into the long abandoned *Lochner* era and engages in a social and economic debate over the objectives and purposes of the tax legislation that, up until today, was securely within the realm of the legislative branch of government. Moreover, it weighs in on a political debate by concluding that the apparent legislative objective of economic development of river communities is "illogical." Clearly, the rational basis test was set up to prevent courts from questioning the underlying policies of economic legislation. This is for our elected leaders to do, not judges. *See Morton Salt Co. v. City of S. Hutchinson,* 159 F.2d 897, 900 (10th Cir.1947) (quoting *Providence Bank v. Billings,* 29 U.S. (4 Pet.) 514, 562, 7 L.Ed. 939, 957 (1830)) ("In the words of Mr. Chief Justice Marshall, 'The intent, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security ... against unjust and excessive taxation ....'"); *accord Motor Club of Iowa,* 265 N.W.2d at 154; *Dickinson,* 240 Iowa at 399, 35 N.W.2d at 71.

A review of cases from around the country in other areas involving statutory classifications helps point out the majority's error. Of course, these cases reveal the general proposition that courts defer to the legislature in reviewing social and economic statutes. I agree with the majority that this deference does not mean that a court can never apply a rational basis test to find social or economic legislation in violation of an equal protection clause. Different conclusions can legitimately result, but courts must be sure that the conflict is based on the law, not policy.

The various decisions among states on the constitutionality of statutes that exempt or favor certain trucking industries from complying with highway weight restrictions serves as an example of how courts can legitimately reach different results. *See* Lorrie M. Marcil, Note, *State Statutes That Exempt Favored Industries From Meeting Highway Weight Restrictions: Constitutionality Under the Equal Protection Clause*, 1984 Duke L.J. 963 (1984). The conflict by courts in this particular area has not occurred by judicial inquiry into and disagreement with the legislative objectives at work behind the statute, but by an examination of the relationship of the statute's objective and the resulting classification. *See id.* at 980–81. In other words, those courts that have found statutes governing exceptions to highway weight restrictions to violate equal protection accept the legislative objectives and purposes to be legitimate, but conclude the pursuit of one purpose (highway safety) by the legislature under the guise of another purpose (favoring a particular industry) is impermissible because the discriminatory classification created between favored and unfavored industries, within the context of the legislative decision to govern the weight of vehicles, is wholly arbitrary. *See id.; see also State v. Amyot*, 119 N.H. 671, 407 A.2d 812, 813–14 (N.H.1979); *Sterling H. Nelson & Sons, Inc. v. Bender*, 95 Idaho 813, 520 P.2d 860, 862–63 (Idaho 1974). Although economic legislation remains a sensitive area for judicial interference, an inquiry into the relationship between the objectives of the statute and the resulting classification is the only area of analysis that can account for different judicial views.[10]

In this case, the legislature uses a taxation statute to pursue the objective of economic development by favoring riverboats over racetracks. Taxation is an area laden with social and economic policy, which is a legislative function to develop. Moreover, it is entirely reasonable and appropriate for a legislature to use taxation to create classifications that favor one person or entity over another. "Where the public interest is served one business may be left untaxed and another taxed, in order to promote the one, or to restrict or suppress the other." *Carmichael v. S. Coal & Coke Co.*, 301 U.S. 495, 512, 57 S.Ct. 868, 873–74, 81 L.Ed. 1245, 1255 (1937) (citations omitted). Moreover,

> it has repeatedly been held and appears to be entirely settled that a statute which encourages the location within the State of needed and useful industries by exempting them, though not also others, from its taxes is not arbitrary and does not violate [equal protection guarantees].

*Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480, 485 (1959). This principle cannot be called into question. It is applied all the time in the legislative arena, and is the basis of much of the economic policy of our state and our country. A contrary approach would turn government on its head. Courts are obligated to trust the legisla-

---

**10.** I most likely would have no disagreement with the majority if our legislature had used a gambling licensing fee, for example, instead of a taxation statute to establish a different classification between riverboats and racetracks, under the guise of providing economic benefits to river communities. Under such a statute, the payment of variant licensing fees would likely have no rational relationship to economic development. In this case, however, the majority reaches the equal protection violation by rejecting the legislative objectives and forces at work in the statute, even though the objectives of the classification (promote riverboat development) conform to a purpose of the tax statute (promote economic development).

tive branch and the people who elect our legislators to devise the economic policies that drive our economy.

A court's view of economic policy must not trump the views of those *elected* to craft policy within the legislative arena. "[A] constitution is not intended to embody a particular economic theory.... It is made for people of fundamentally differing views...." *Lochner*, 198 U.S. at 75–76, 25 S.Ct. at 547, 49 L.Ed. at 949 (Holmes, J., dissenting). As Justice Holmes wisely cautioned:

> Courts should be careful not to extend [the express prohibitions of the constitution] beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.

*Tyson & Brother-United Theatre Ticket Offices, Inc. v. Banton*, 273 U.S. 418, 446, 47 S.Ct. 426, 434, 71 L.Ed. 718, 729 (1927) (Holmes, J., dissenting).

From an analytical standpoint, the only accepted means for a court to legitimately find a taxation case of this nature violates equal protection is by considering the relationship between the object of the taxation statute and the classification that results. Here, our legislature used the taxation statute with an objective to foster economic development. The classification exists under the statute to promote the riverboat industry and stimulate economic development. Both objectives are certainly legitimate and compatible, and the favoritism granted to riverboats is done in a straightforward manner under a statute that exists to accomplish the specific goal, not under a statute that serves a different purpose. Thus, unlike the conflict among courts over weight-restriction statutes, the basis for the classification in this case relates directly to the object of the statute. Consequently, the case ultimately comes down to whether the discriminatory classification is too underinclusive. This is the only legitimate area of inquiry from which the majority can strike down the statute.

The majority, of course, claims riverboats and racetracks are the same enterprise, which makes the different classification created by the legislation wholly arbitrary. It acknowledges the "overinclusive-underinclusive dichotomy" is normally applied only to a strict scrutiny analysis, and is only helpful to a rational basis analysis when a classification involves "extreme degrees of overinclusion and underinclusion" in relationship to the legislative goal. *Bierkamp*, 293 N.W.2d at 584. Clearly, this approach has limited value in an equal protection analysis. Yet, the majority evades this limitation by repeatedly claiming that there is no recognizable difference between riverboats and racetracks. This claim has no basis in fact, and accepting it as the foundation or premise that drives the analysis leads to a pure and simple act of legislating. Clearly, the law does not favor the position of the majority, so the facts become unnecessarily circumscribed to conform to the very narrow window available to render the statute unconstitutional under our equal protection clause. Yet, the majority's reasoning imposes serious consequences upon the legislative branch, which has justifiably relied upon its freedom granted under the law to create classifications in tax statutes by imposing a greater tax burden on one of the two types of gambling enterprises permitted in Iowa.

Mathematical exactness between the goal of the statute and the means selected by the legislature to achieve that goal is not required. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 814, 96 S.Ct. 2488, 2500, 49 L.Ed.2d 220, 234 (1976) ("[I]n the [economic] area ... the Equal Protection Clause does not demand a sur-

veyor's precision" in creating classifications.); *Sperfslage*, 480 N.W.2d at 49 ("Taxation is not an exact science."). Instead, it has been widely recognized, for perhaps as long as Iowa has been a state, that:

> The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific. But even such criticism should not be hastily expressed. What is best is not always discernable; the wisdom of any choice may be disputed or condemned. Mere errors of government are not subject to our judicial review. It is only its palpably arbitrary exercises which can be declared void [pursuant to equal protection guarantees]. . . .

*Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 (1913); *accord Sperfslage*, 480 N.W.2d at 49; *Motor Club of Iowa*, 265 N.W.2d at 154; *Dickinson*, 240 Iowa at 398–99, 35 N.W.2d at 71. Thus, under the rational basis analysis, courts are compelled "to accept the legislature's generalizations even when there is an imperfect fit between means and end" and a classification is not unconstitutional " ' "because in practice it results in some inequality" ' ". *Heller v. Doe by Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257, 271 (1993) (citations omitted); *accord Sperfslage*, 480 N.W.2d at 49; *Motor Club of Iowa*, 265 N.W.2d at 154; *Dickinson*, 240 Iowa at 401, 35 N.W.2d at 72. A tax classification simply requires some "reasonable distinction, or difference in state policy." *Allied Stores of Ohio, Inc.*, 358 U.S. at 528, 79 S.Ct. at 441, 3 L.Ed.2d at 485; *accord Motor Club of Iowa*, 265 N.W.2d at 154 ("The differences on which the classification is based need not be great or conspicuous."); *Dickinson*, 240 Iowa at 401, 35 N.W.2d at 72.

Our legislature could have realistically considered riverboats to be as different from racetracks as night is from day. Yet, the majority concludes that riverboats and racetracks are the same because both produce revenue from gambling and both contribute to economic development. Although the two enterprises both produce gambling revenues, they are very different in very legitimate ways. Not only do they operate with vastly different approaches, they contribute to economic development in Iowa in very different ways. The majority argues that . riverboats and racetracks are the same because they have the same potential to contribute to the economic development of the communities in which they are located. This may or may not be true (our legislature may know, which helps explain why the decision is their decision), but it simply misses the point and ignores the obvious reality of the situation. It is not important that both industries help the area economy in which they are located. Instead, what is important from the perspective of using a taxation statute is that riverboats can be located in many more communities than racetracks and can provide economic benefit for far more Iowa communities than racetracks.

The majority claims that this reality is not common knowledge that our legislature could have contemplated, but such a statement ignores the world around us. It ignores that racetracks require a large metropolitan area to operate and survive, or some other unique circumstances. Dog and horse racing is a specialized industry that would quickly fold if not located in a unique area that is capable of supporting it. Racetracks are sparsely located, not only around Iowa, but around the country. This is common knowledge. *See Federal Land Bank*, 426 N.W.2d at 157 ("In evaluating the reasons for [a] classification . . . we are obliged to consider 'matters of com-

mon knowledge and common report and the history of the times.'" (Citation omitted.)). Riverboats, on the other hand, are not encumbered with the special industry needs of horse and dog racing. Consequently, they can go into smaller communities in which racetracks cannot. This distinction is clearly shown by the current location of riverboats around Iowa, as well as the numerous proposed sites for additional riverboats around the state.

Perhaps the best test for the legitimacy of a classification made by a legislature is to consider if it actually promotes the public welfare. As Justice Frankfurter observed:

the great divide in [equal protection] decisions lies in the difference between emphasizing the actualities or the abstractions of legislation.... Classification is inherent in legislation; the Equal Protection Clause has not forbidden it. To recognize marked differences that exist in fact is living law; to disregard practical differences and concentrate on some abstract identities is lifeless logic.

*Morey v. Doud,* 354 U.S. 457, 472, 77 S.Ct. 1344, 1354, 1 L.Ed.2d 1485, 1495–96 (1957) (Frankfurter, J., dissenting). Without question, the current and proposed riverboats in Iowa show that many more Iowa communities can benefit from riverboat gambling than racetrack gambling. It is entirely conceivable that our legislature could have foreseen, in choosing the different tax structure, the very circumstances occurring today. *See generally* Tim Jamison, *The Boat Vote: Stakes High Tuesday in Gambling Referendum, Waterloo–Cedar Falls Courier,* Oct. 5, 2003, at A1 (" 'Look at what's happening at the Quad Cities, Dubuque, Marquette, Des Moines, Council Bluffs, Tama, everywhere there is gambling in the state,' " said the man who "spearheaded the drive for a Black Hawk County riverboat. 'This will be good for the community.' "). The tax break for riverboats was not given as an impermissible preference for the riverboat industry over the racetrack industry. Instead, it was for the public who benefits far greater from riverboat development. The expansion of riverboat gambling in Iowa is something that could have been envisioned by our legislature. The objective to help more Iowa communities—including those that might be considered a more "typical" Iowa community—certainly could have been a purpose our legislature sought to achieve by favoring riverboats over racetracks. Consequently, the superior economic advantage of riverboats to more Iowa communities justifies a different taxation classification to promote riverboat development.

The majority tries to undercut this reality by pointing out that two racetracks provide economic development to two river communities and one riverboat is located near a nonriver community. Apparently, the majority believes this establishes an "extreme degree[ ] of overinclusion and underinclusion." *Bierkamp,* 293 N.W.2d at 584. If this is so, then the majority has eviscerated the equal protection analysis in the area of taxation. The fact is that there are currently nine riverboats located in five river communities in Iowa along the Mississippi River and two river communities along the Missouri River. There is one riverboat located on a lake near Osceola. There are three racetracks in Iowa, two in river communities. The fact that two racetracks provide economic benefit to two of the seven river communities is far from extreme underinclusion. If this constitutes extreme underinclusion, many of our tax laws are in serious jeopardy.

The majority uses *Federal Land Bank* to support its logic, but this case is far from helpful to the majority, or even comparable. *See* 426 N.W.2d 153. In *Federal*

*Land Bank*, we held that a statute that provided for a different redemption period in foreclosure proceedings for purchasers who were lender "members" of one of three federal lending oversight entities than for other "nonmember" lenders violated equal protection. *See id.* at 156–58. We noted that the purposes of the different redemption periods—to encourage lenders who did not have a stake in a community to nevertheless help financially strapped farmers retain their homesteads and to pressure nonmember institutions to dispose of foreclosed farmland more quickly—were permissible, but found the different classification was not reasonably related to these purposes because "nonmembers" included individual Iowans who held a mortgage, Iowa insurance companies, Iowa mortgage companies who were not federally insured, and federal land bank associations, all of whom had the same "stake" in the process and were just as likely as "member" institutions to provide forbearance to farmers and dispose of land under similar timing considerations. *Id.* at 156–57. Thus, although the purpose of the statute was legitimate, the different classifications included only three groups of lenders and excluded five groups of lenders who could be affected by the statute the same as the three lender groups.

I have no trouble concluding that the underinclusion in *Federal Land Bank* constitutes an "extreme" degree to justify court intervention on equal protection grounds. Moreover, there was no argument that the five excluded lender groups would not be as likely to help the family farmer as the included Iowa lenders. *See id.* at 156–57. This case is vastly different. The underinclusion is far from extreme, and a clear realistic argument exists that the excluded industry does not satisfy the legislative objective in the same manner as the included industry. There are no cases, within or outside of Iowa, that support the majority's position in this case.

It is also important to observe that the majority attempts to validate its independent interpretation approach on the basis of *Bierkamp*. 293 N.W.2d 577. It uses *Bierkamp* as an example of an instance where this court has rejected a rational basis conclusion of the Supreme Court. This reliance, however, is misplaced.

Any reliance on *Bierkamp* as authority of this court to apply the equal protection analysis to reach a different conclusion than the Supreme Court in this case fails to recognize that the Supreme Court decision at issue, *Silver v. Silver*, 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929), was issued fifty-one years prior to *Bierkamp*. 293 N.W.2d at 579. It also fails to recognize that we had previously followed *Silver*. *Id.* at 581. It further fails to recognize that we observed a clear trend among other states to depart from the Supreme Court decision because it no longer represented the views of today's society. *See id.* at 580–82. It was, in short, simply an outdated rationale that had lost support. None of this is involved in this case.

In this case, the Supreme Court found a rational basis in the very same case before us, with the very same facts and reasons, as well as the same legal analysis. In this light, it is difficult, if not impossible, to reconcile conflicting court opinions—one finding a reason for the classification to be rational and the other finding the reason to be totally arbitrary—in an area where the legislature is given its broadest authority possible to make classifications. Our law requires that "every reasonable basis upon which [a] classification may be sustained" to be negated. *Id.* at 579–80. Instead, the majority negates the decision of the Supreme Court. I know of no other court in the country that has reached a conclusion in conflict with the Supreme

Court on remand of the very same case involving a rational basis examination of a tax statute.[11]

Finally, I am perhaps most troubled by the systemic values that are trampled through the procedural process seized on by the majority in exercising its judicial independence. In the end, the majority decision nullifies the *unanimous* judgment of the Supreme Court and effectively renders the Court's opinion in *Fitzgerald* advisory and no more. *See* Richard W. Westling, Comment, *Advisory Opinions and the "Constitutionally Required" Adequate and Independent State Grounds Doctrine,* 63 Tul. L.Rev. 379, 381 n. 6 (1988); *see also Arizona v. Evans,* 514 U.S. 1, 32, 115 S.Ct. 1185, 1202, 131 L.Ed.2d 34, 58 (1995) (Ginsburg, J., dissenting) ("Even if [state courts'] reinstatements [of prior judgments on remand] do not render the Supreme Court's opinion technically 'advisory,' they do suggest that the Court unnecessarily spent its resources on cases better left . . . to state-court solution." (Citation omitted.)). This is an affront to the Supreme Court and the principles of federalism that underlie the entire judicial system.

As acknowledged, one of our court's primary and overarching purposes is to faithfully and carefully serve as the final arbiter of our state constitution. The Supreme Court serves the same role in relation to the federal constitution. Both courts have the duty to be conscientious stewards of the federal or a state constitution when it is invoked in the course of a case before it. These duties—which create numerous potential conflicts caused by differing interpretations of federal and state constitutional provisions by the two courts—form one of the bedrock functions of our judicial system.

The Supreme Court has wrestled with its role in relation to state courts of last resort and articulated standards by which a state court can protect its right to be the final arbiter of its state's constitution. At the same time, the Court has sought to protect its role as final arbiter of federal constitutional principles. To these ends, the Court has recognized:

This Court from the time of its foundation has adhered to the principle that it will not review judgments of state courts that rest on adequate and independent state grounds. The reason is so obvious it has rarely been thought to warrant statement. It is found in the partitioning of power between the state and federal judicial systems and in the limitations of our own jurisdiction. Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its view of federal laws, our review could amount to nothing more than an advisory opinion.

---

**11.** Other courts have reached a decision contrary to the Supreme Court on remand in the same case, but these decisions have typically come in areas involving individual rights in the criminal case context. *See People v. Ramos,* 37 Cal.3d 136, 207 Cal.Rptr. 800, 689 P.2d 430, 444 (Cal.1984); *Van Arsdall v. State,* 524 A.2d 3, 13 (Del.1987); *Sitz v. Dep't of State Police,* 443 Mich. 744, 506 N.W.2d 209, 224 (Mich.1993); *People v. P.J. Video, Inc.,* 68 N.Y.2d 296, 508 N.Y.S.2d 907, 501 N.E.2d 556, 564–65 (N.Y.1986); *People v. Class,* 67 N.Y.2d 431, 503 N.Y.S.2d 313, 494 N.E.2d 444, 445 (N.Y.1986); *Commonwealth v. Labron,* 547 Pa. 344, 690 A.2d 228, 228–29 (Pa.1997); *State v. Chrisman,* 100 Wash.2d 814, 676 P.2d 419, 424 (Wash.1984). The principles elucidated and applied in these types of cases are vastly different from the principles applicable to an equal protection analysis of a tax statute.

*Herb v. Pitcairn,* 324 U.S. 117, 125–26, 65 S.Ct. 459, 463, 89 L.Ed. 789, 794–95 (1945) (citations omitted); Westling, 63 Tul. L.Rev. at 403 ("If the Supreme Court issues [an advisory] opinion, notwithstanding the ban, its opinion falls into a noncategory of judicial decisions . . . in conflict with the notions of limited jurisdiction, stare decisis, and constitutionally required doctrines of justiciability."). The Court's most important recent pronouncement in this area came in *Michigan v. Long,* 463 U.S. 1032, 1037–42, 103 S.Ct. 3469, 3474–77, 77 L.Ed.2d 1201, 1212–15 (1983). There, the Court reexamined the "adequate and independent state grounds" standard and, in effect, requested the cooperation of state courts of last resort to help prevent the Court from infringing upon the state court's application of state constitutional principles. *Id.* at 1041, 103 S.Ct. at 3476–77, 77 L.Ed.2d at 1214–15 (articulating the "plain statement" standard, by which a state court can convey to the Court that any invocation of federal principles in its disposition of a case was merely for the purpose of supporting a judgment or opinion based on "adequate and independent state grounds").

We did not state in *RACI* that our opinion was based on "adequate and independent state grounds" nor did we even indicate that might be the case. *Long,* 463 U.S. at 1042, 103 S.Ct. at 3477, 77 L.Ed.2d at 1215; *accord RACI,* 648 N.W.2d 555. Instead, we observed that "Iowa courts are to 'apply the same analysis in considering the state equal protection claims as . . . in considering the federal equal protection claim." *RACI,* 648 N.W.2d at 558. In the absence of a signal as to whether our decision was based predominantly on state principles rather than federal principles, the Supreme Court assumed we had intermixed those principles in our decision and assumed jurisdiction of the case to exercise its duty to protect the federal consti-

tution from an errant interpretation by our court. *See Fitzgerald,* 539 U.S. at ——, 123 S.Ct. at 2158–59, 156 L.Ed.2d at 102 ("We have previously held that, [in circumstances in which a state court states that it applies the same equal protection analysis in considering federal and state equal protection claims], we shall consider a state-court decision as resting upon federal grounds sufficient to support this Court's jurisdiction."); *see also* Westling, 63 Tul. L.Rev. at 389.

While our apparent inadvertence in designating the basis for our decision in *RACI* is troubling, the effect of that choice is compounded by the majority result reached in this case. In reaching its decision, the majority notes that we have not always followed federal constitutional jurisprudence in interpreting Iowa's equal protection clause and determines that our analysis in this case reaches a result different from that of the Supreme Court. Even if these were acceptable conclusions standing alone, both simply serve at this point to effectively resurrect "adequate and independent state grounds" on which *RACI* could have been based. *Long,* 463 U.S. at 1042, 103 S.Ct. at 3477, 77 L.Ed.2d at 1215. Yet, these considerations are only revealed now on remand from the Supreme Court, which assumed jurisdiction based on our statement that our federal and state equal protection analyses are the same.

In the end, the majority is taking a second bite at an apple that has long since dropped and rolled away from our tree. While this may be our prerogative, it does not make the exercise of this prerogative any less injurious to the systemic values implicated in this case. The majority opinion in *RACI I* stated that our equal protection analyses under both constitutions are the same. The majority opinion here, in *RACI II,* reveals that our equal protection

analyses are different. Not only is this reconsideration intellectually inconsistent, it is also offensive to the Supreme Court, its important role in the judicial system, and the principles of federalism on which our entire system operates. In the end, the parties to this appeal will receive a final resolution of their controversy only after needlessly taking the case before the Supreme Court. Moreover, the Supreme Court will have needlessly considered an issue that could have been resolved if the majority had discovered and emphasized the supposed differences in our analyses during the course of our first consideration of this case.

The decision of the majority causes great harm to the law, to the concept of federalism, to the doctrine of judicial economy, to the essential reliability of legal principles, and to the balance of power within our government. Perhaps most troubling of all, it also causes a great injustice to the people of Iowa. It is never an easy decision to dissent, but that decision has never been easier than in this case.