Paula J. TYLER and Mark
J. Alcorn, Appellants,

v.

IOWA DEPARTMENT OF
REVENUE, Appellee.

No. 16-1731

Supreme Court of Iowa.

Filed November 17, 2017

Erich D. Priebe and David J. Dutton of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Thomas J. Miller, Attorney General, Donald D. Stanley Jr., Special Assistant Attorney General, and Hristo Chaprazov, Assistant Attorney General, for appellee.

MANSFIELD, Justice.

This administrative review proceeding requires us to decide whether Iowa may constitutionally deny an inheritance tax exemption for bequests to stepchildren when the marriage between parent and stepparent was dissolved before the stepparent's death, while granting an exemption when the marriage was not dissolved. We con-

clude that this differential treatment based on divorce of the parent and stepparent does not violate article I, section 6 of the Iowa Constitution. The different tax treatment of these two categories is rationally related to the legislature's legitimate state interest in promoting and preserving family relationships through the tax laws. Accordingly, we affirm the judgment of the district court and the administrative ruling of the Iowa Department of Revenue.

## I. Background Facts and Proceedings.

Petitioners Paula Tyler (born 1963) and Mark Alcorn (born 1958) are the biological children of Joseph and Constance Alcorn. Joseph and Constance divorced in 1964. Joseph paid child support after the divorce but did not have regular visitation with Paula and Mark. Joseph died in 2007 or 2008.

In 1966, Constance married the decedent, Donald Hitzhusen. Constance, Paula, and Mark moved to Rockwell to reside with Donald on his family farm. Donald treated Mark and Paula as his own children. He helped pay for them to attend college. Both Mark and Paula eventually moved to Texas. Each of them married in Texas, but they maintained a close personal relationship with Donald.

In 2001, Constance and Donald divorced after thirty-five years of marriage. Yet Donald remained close with both Paula and Mark. In 2007, Donald gave both Paula and Mark his power of attorney so they could assist him with financial matters. Donald also executed a medical power of attorney, designating Mark primary agent and Paula secondary agent as to health care decision-making.

In 2008, Donald executed a will and revocable trust leaving his estate to Paula, Mark, and Constance, with Paula and Mark receiving larger shares than Constance. In 2012, Donald passed away.

The inheritance tax return originally filed with the State of Iowa in October 2013 reported tax due on the bequests going to all three beneficiaries—Paula, Mark, and Constance. The tax due on Paula's and Mark's shares was paid under protest. Approximately five months later, in March 2014, the estate filed an amended tax return claiming no inheritance tax was actually due on Paula's and Mark's shares. Thus, under the amended return, inheritance tax would be due only on the 23% of the $1.823 million estate going to Constance, not on the 77% of the estate being divided equally between Paula and Mark. The estate therefore sought a refund of approximately $203,000 for inheritance tax previously paid on Paula's and Mark's shares.

For many years prior to 1997, the Iowa inheritance tax had an unlimited exemption for any share of the estate passing to the surviving spouse, limited exemptions for lineal descendants and lineal ascendants, and no exemption for stepchildren. *See* Iowa Code § 450.9 (1997). That year, the general assembly enacted legislation that eliminated the inheritance tax on property passing to parents, grandparents, great-grandparents, children, stepchildren, grandchildren, and great-grandchildren, among others. *See* 1997 Iowa Acts ch. 1, § 2 (codified at Iowa Code § 450.9 (1999)).

In 2003, the general assembly passed legislation making a series of changes to the inheritance tax and the probate code. *See* 2003 Iowa Acts ch. 95. Among those changes was the insertion of the following definition of "stepchild":

"Stepchild" means the child of a person who was married to the decedent at the time of the decedent's death, or the child of a person to whom the decedent was

married, which person died during the marriage to the decedent.

*See id.* § 1 (codified at Iowa Code § 450.1(1)(*e*) (2005)).

Thus, as of 2003, "stepchild" for purposes of the inheritance tax exemption was limited to stepchildren of a decedent who had not divorced the parent prior to the decedent's death.

Based on this statutory definition, the Iowa Department of Revenue denied Donald's estate's request for a refund in a letter dated April 10, 2014. The letter explained that because Constance and Donald were divorced at the time of Donald's death, Paula's and Mark's shares of the estate were not eligible for the stepchild tax exemption.

Paula and Mark then filed a protest with the department on May 7, challenging the denial of the tax refund on the ground that the statute's classification of stepchildren violated their equal protection rights under article I, section 6 of the Iowa Constitution.

Following a contested hearing on April 10, 2015, an administrative law judge issued a proposed decision on February 26, 2016, setting forth findings of fact and conclusions of law and rejecting the equal protection challenge. This decision became final when Paula and Mark declined to appeal to the director of the department.

Paula and Mark thereafter filed a timely petition for judicial review with the Iowa District Court for Polk County. On September 14, the district court issued a ruling affirming the department's decision. The court reasoned,

> The challenged classification is rationally related to the legitimate state interests of promoting the development of close legal relationships and stability in families raising stepchildren. Close legal relations and stability within the family unit created by the parents' marriage are vital to proper child-rearing, and providing stable homes for children is undoubtedly a legitimate state interest. Approximately four and one half percent of all households in the United States with children under the age of eighteen are blended families raising stepchildren and biological children. Granting an inheritance tax exemption to stepchildren (as defined in section 450.1(1)(e)) of blended households in Iowa puts the stepchildren and the biological children in such families on equal footing when it comes to their inheritance tax obligations, should one of the parents pass away during the marriage. The legislature may have concluded that removing such inequality would help strengthen the legal relations in blended families. Once a blended family is terminated by divorce, however, there no longer is any need to strengthen the legal relations within the family unit because the divorce dissolved the family unit. The legitimate governmental interest of providing stable homes for raising children in blended families disappears upon divorce.

> . . . .

> . . . With respect to taxpayers whose biological parent and stepparent divorced prior to the death of either parent the legislature may have concluded that the balancing of these competing considerations weighed against granting an exemption.

> . . . .

> . . . The challenged classification is neither extremely overinclusive nor extremely underinclusive, and, therefore, section 450.1(1)(e) should be upheld as constitutional.

(Citations and footnote omitted.)

Paula and Mark appealed, and we retained the appeal.

## II. Standard of Review.

██ "We generally review a district court's decision on a petition for judicial review of agency action for correction of errors at law. However, in cases ... where constitutional issues are raised, our review is de novo." *LSCP, LLLP v. Kay-Decker*, 861 N.W.2d 846, 854 (Iowa 2015) (alteration in original) (quoting *Qwest Corp. v. Iowa State Bd. of Tax Review*, 829 N.W.2d 550, 557 (Iowa 2013)).

## III. Analysis.

██ **A. The Legal Standards.** Article I, section 6 of the Iowa Constitution states, "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art I, § 6. This clause of our constitution "is essentially a direction that all persons similarly situated be treated alike." *Varnum v. Brien*, 763 N.W.2d 862, 878 (Iowa 2009) (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI II)*, 675 N.W.2d 1, 7 (Iowa 2004)); *accord Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 49 (Iowa 2016). "We may conclude [article I, section 6] is more protective [than the Fourteenth Amendment]." *LSCP*, 861 N.W.2d at 856.

██ The parties agree that the rational basis test applies to our review of Iowa Code section 450.1(1)(e) (2017). *See LSCP*, 861 N.W.2d at 858 ("[W]e ensure uniform operation under the Iowa Constitution by reviewing economic legislation—which includes tax statutes—under a rational basis test."). Under the rational basis test, "the statute need only be rationally related to a legitimate state interest." *Qwest*, 829 N.W.2d at 558 (quoting *Sanchez v. State*, 692 N.W.2d 812, 817–18 (Iowa 2005)). This standard "is especially deferential in the context of classifications made by complex tax laws." *LSCP*, 861 N.W.2d at 856 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992)). In tax matters, "the legislature possesses the greatest freedom in classification." *Qwest*, 829 N.W.2d at 558 (quoting *Hearst Corp. v. Iowa Dep't of Revenue & Fin.*, 461 N.W.2d 295, 305 (Iowa 1990)). For this reason, tax laws analyzed under the rational basis test "have generally been upheld without much difficulty." *LSCP*, 861 N.W.2d at 859 (quoting *Qwest*, 829 N.W.2d at 558).

██ Despite this deference, the state's freedom in classification is not absolute. Under the rational basis test, we must determine not only that the statute serves a legitimate governmental interest, but also that the interest itself is "realistically conceivable" and has a "basis in fact." *See RACI II*, 675 N.W.2d at 7–8; *see also Residential & Agric. Advisory Comm.*, 888 N.W.2d at 50. To meet that requirement, "actual proof of an asserted justification [is] not necessary, but [we will] not simply accept it at face value and [will] examine it to determine whether it [is] credible as opposed to specious." *Qwest*, 829 N.W.2d at 560. Further, the relationship between the classification and the purpose must not be "so weak that the classification must be viewed as arbitrary." *McQuistion v. City of Clinton*, 872 N.W.2d 817, 831 (Iowa 2015) (quoting *RACI II*, 675 N.W.2d at 8).

██ In challenging the constitutionality of section 450.1, Paula and Mark face a heavy burden. "The burden is not on the government to justify its action, but for the plaintiff to rebut a presumption of constitutionality." *McQuistion*, 872 N.W.2d at 831. Paula and Mark must "negate every reasonable basis upon which the classification may be sustained." *Varnum*, 763

N.W.2d at 879 (quoting *Bierkamp v. Rogers*, 293 N.W.2d 577, 579–80 (Iowa 1980)). Even if some inequality arises from the law's application, this does not invalidate the law. *See Qwest*, 829 N.W.2d at 555. "[T]he fit between the means chosen by the legislature and its objective need only be rational, not perfect." *LSCP*, 861 N.W.2d at 859; *accord Qwest*, 829 N.W.2d at 555; *City of Waterloo v. Selden*, 251 N.W.2d 506, 508–09 (Iowa 1977) ("An iron rule of equal taxation is neither attainable nor necessary."). Only a "rough correspondence between the asserted state interest and the classification" must be shown. *Qwest*, 829 N.W.2d at 559.

**B. Applying Those Standards to This Case.** Although most states have abolished their death taxes, six states (including Iowa) still have an inheritance tax. *See* Iowa Code § 450.9; Ky. Rev. Stat. Ann. § 140.010 (West, Westlaw through 2017 Reg. Sess.); Md. Code Ann. Tax–Gen. § 7-202 (West, Westlaw through 2017 Reg. Sess.); Neb. Rev. Stat. Ann. § 77-2001 (West, Westlaw through 1st Reg. Sess 2017); N.J. Stat. Ann. § 54:34-1 (West, Westlaw through L. 2017, c.237 & J.R. No. 18) 2017); 72 Pa. Stat. and Cons. Stat. Ann. § 9106 (West, Westlaw through 2017 Reg. Sess. Acts 1–36, 41 & 45). All of these state laws favor family beneficiaries in a variety of ways. Nebraska does not have an exemption or special inheritance tax rate for stepchildren, but confers a special rate on "any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent." *See* Neb. Rev. Stat. Ann. § 77-2004.

The department contends that Paula and Mark are not "similarly situated" as compared with stepchildren whose natural parent has not been divorced from the stepparent. This inquiry is a threshold question for determining whether an equal protection violation has occurred. *See Tim-* *berland Partners XXI, LLP v. Iowa Dep't of Revenue*, 757 N.W.2d 172, 175 (Iowa 2008); *see also Baker v. City of Iowa City*, 867 N.W.2d 44, 56 (Iowa 2015) ("The first step in determining whether a statute violates equal protection is to determine whether the statute creates different classifications between similarly situated persons.").

Paula and Mark counter they are similarly situated because their close relationship with Donald continued after the legal relationship between their mother Constance and their stepfather Donald had been severed. They also maintain that based on the doctrine of relation by "affinity," we previously indicated in two statutory interpretation cases that a stepchild retains that status notwithstanding the termination of the marriage by death or divorce. *See Farnsworth v. Iowa State Tax Comm'n*, 257 Iowa 280, 284, 132 N.W.2d 477, 480 (1965); *Simcoke v. Grand Lodge of A.O.U.W. of Iowa*, 84 Iowa 383, 388, 51 N.W. 8, 9 (1892). From this, they urge they are similarly situated to stepchildren whose parent and stepparent did not undergo a divorce.

We will assume for this appeal that both categories of stepchildren are similarly situated. As we have said, "No two groups are identical in every way, and 'nearly every equal protection claim could be run aground onto the shoals of a threshold analysis if the two groups needed to be a mirror image of one another.'" *Qwest*, 829 N.W.2d at 561 (quoting *Varnum*, 763 N.W.2d at 883); *see also LSCP*, 861 N.W.2d at 860 (assuming without deciding for purposes of the analysis that the plaintiff was similarly situated). "The purposes of the law must be referenced in order to meaningfully evaluate whether the law equally protects all people similarly situated with respect to those purposes." *Varnum*, 763 N.W.2d at 883. So we will

pass over the "similarly situated" inquiry and focus instead on the grounds justifying the law. *See LSCP*, 861 N.W.2d at 860 (assuming without deciding that "LSCP has identified a class of similarly situated taxpayers subjected to allegedly different treatment"); *Qwest*, 829 N.W.2d at 561 (same).

As noted, we do not simply take the purported governmental interests at face value but will examine them ourselves to determine whether they are realistically conceivable and have a proper basis in fact. *See Qwest*, 829 N.W.2d at 560. Although raising revenue is not sufficient on its own to be a legitimate interest, *see RACI II*, 675 N.W.2d at 13, we have held that generating tax revenues may be a sufficient governmental interest when paired with the goal of achieving a fair distribution of the tax burden, *see Dickinson v. Porter*, 240 Iowa 393, 406, 35 N.W.2d 66, 75 (1948).

██ Here, we agree with the department and the district court that promoting family relationships and close connections among relatives are legitimate state goals. As seen above, family-based tax exemptions or favorable tax rates are commonplace in inheritance tax laws. They are intended to promote and preserve the family relationship while balancing that interest against the goal of raising revenue. Favorable tax treatment of intrafamily transfers, at the most basic level, allows more assets to remain within the family. This strengthens the family and helps the family maintain financial security. Such tax laws also incentivize persons to keep their wealth within that group rather than transferring it outside. In addition, these laws promote harmonious intrafamily relations.

Paula and Mark do not really dispute that protecting the family unit is a legitimate state interest. They do not contend, for example, that the inheritance tax laws need to treat all beneficiaries the same or cannot favor family over nonfamily beneficiaries. In this case, for instance, no one is claiming it is improper for Donald's testamentary transfer to *his ex-wife Constance* to be taxed, although he obviously maintained an amicable enough relationship with her to bequeath her over $418,000 worth of assets.

The purpose of the statute, however, could just as easily be characterized as the promotion of close family relationships: bequests to close relatives are encouraged by taxing those bequests at a lower rate than are bequests to more distant relatives and nonrelatives.

*Estate of Kunkel v. United States*, 689 F.2d 408, 416 (3d Cir. 1982) (rejecting an equal protection challenge to a Pennsylvania state inheritance tax that subjected bequests to stepgrandchildren to a higher rate of taxation than bequests to grandchildren or stepchildren); *see also Mueller Estate v. Transfer Inheritance Tax Bureau*, 5 N.J. Tax 642, 649, 653 (1983) (rejecting an equal protection challenge to a New Jersey law that made a similar distinction).

We ourselves have indicated that the state has a legitimate interest in "promoting the sanctity and stability of the family." *Callender v. Skiles*, 591 N.W.2d 182, 191 (Iowa 1999) (stating also that it is "an important value in our society"); *see also Varnum*, 763 N.W.2d at 883 (recognizing a legitimate state interest in a "stable framework" for couples raising children); *State v. Mitchell*, 757 N.W.2d 431, 438–39 (Iowa 2008) (finding a legislative distinction between married and unmarried cohabitation in the sex offender laws met the rational basis test). When a parent of a child marries someone who is not a parent of that same child, the state has an appropriate interest in promoting this network

of intrafamily relationships, including the stepparent-stepchild relationship. A tax exemption for testamentary transfers from stepparent to stepchild serves this end.

The question, therefore, is not the legitimacy of the end, but whether a line drawn between stepchildren whose parent previously divorced the stepparent and stepchildren whose parent had not divorced the stepparent meets the rational basis test. This is the "fit" question.

We think the fit is adequate for article I, section 6 purposes. It is "neither overinclusive nor underinclusive to an extreme degree." *LSCP*, 861 N.W.2d at 862. Nor is it "illogical." *Qwest*, 829 N.W.2d at 561 (quoting *RACI II*, 675 N.W.2d at 10). When a divorce occurs, the parent and the stepparent no longer form a single family unit. Thus, favorable tax treatment of transfers from stepparent to stepchild is no longer needed to promote or protect *that family*. Also, to the extent beneficial tax treatment is intended to promote *certain close relationships among relatives*, it is not illogical to assume that—on average—the relationship between the stepparent and stepchild is closer during a marriage than after a divorce.

Indeed, *Webster's Dictionary* defines stepchild as "a child of one's wife or husband by a former partner." *Stepchild, Merriam-Webster's Collegiate Dictionary* (11th ed. 2014). By that definition, Paula and Mark ceased to be stepchildren of Donald upon his divorce from Constance. This is the same result provided by Iowa Code section 450.1(1)(e).[1]

As the district court put it,

The challenged classification does not punish (by imposing inheritance tax)

former stepchildren for the parents' decision to divorce. It merely removes an incentive that promotes the development of close legal relations within the family unit once that unit is dissolved by divorce. The legislat[ure] may have concluded that once the family unit is dissolved upon divorce, there is less likelihood that the former stepchild and stepparent will have an ongoing personal relationship.

True, in this particular case, Donald regarded Paula and Mark as his children. The three of them were close. But the fit can be "far from perfect," so long as the relationship "is not so attenuated as to render the distinction arbitrary or irrational." *Varnum*, 763 N.W.2d at 879 & n.7 (quoting *RACI II*, 675 N.W.2d at 7); *see also LSCP*, 861 N.W.2d at 859; *Qwest*, 829 N.W.2d at 555; *Selden*, 251 N.W.2d at 508–09. The necessary line drawn by the legislature need not be exact, nor must it preclude all instances of inequality in its application. *See LSCP*, 861 N.W.2d at 859; *see also Estate of Kunkel*, 689 F.2d at 417 ("[I]t is for the legislature, and not the courts, to decide how much weight, if any, to place on factors such as blood relationship and family ties in determining which relatives should be included in 'Class A' and which in 'Class B.' The exact point at which the lines are drawn inevitably will have a degree of arbitrariness; yet as one court has noted, '(*l*)egislative line drawing . . . may produce different tax consequences in nearly identical situations, but such lines must be drawn to make a tax system workable and alterable.' That unfortunate, but inevitable degree of arbitrariness, cannot provide a basis for invali-

---

1. This is not the only place where Iowa law draws a line between stepchildren whose parent and stepparent are still married and stepchildren whose parent and stepparent have been divorced. *See State v. Meyers,* 799 N.W.2d 132, 137 n.2 (Iowa 2011) (citing Iowa Code § 726.2 (2011)) ("Iowa prohibits a sexual relationship between stepparent and stepchild when the parents are still married.")

dating a statutory classification under the equal protection clause." (quoting *Beals v. Comm'r of Corps. & Taxation*, 370 Mass. 781, 352 N.E.2d 692, 695 (1976))).

Notably, this is not a case where the legislative classification was based on an immutable characteristic. *See Varnum*, 763 N.W.2d at 892–93 (discussing this issue). Donald, Paula, and Mark could have avoided the $203,000 in inheritance taxes by arranging for Paula and Mark to be adopted before Donald's death. *See Roll v. Newhall*, 888 N.W.2d 422, 424 (Iowa 2016) ("In 2007, Russell was adopted as an adult by his paternal aunt, Janice Anway, who wished to avoid Iowa's inheritance tax on her estate.").

Nor does the law prevent Donald from leaving property to his ex-wife's children. It simply imposes the same rate of inheritance tax as for Donald's transfers to his ex-wife. That rate would also apply to transfers by Donald to any nephews, nieces, or cousins, for example. *See* Iowa Code § 450.10(2).

As we see it, the legislature basically had three choices. It could have drafted Iowa Code chapter 450 on the basis that divorce of a parent and a stepparent generally *does not* alter the stepparent's relationship with her or his former stepchildren. This is Paula and Mark's favored approach. Alternatively, the legislature could have followed the working assumption that divorce generally *does* alter that relationship, just as divorce generally alters the relationship between the divorced parties themselves. That is what the legislature actually did. Or Iowa could have enacted a system like Nebraska's,

making favored tax treatment available to "any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent." Neb. Rev. Stat. Ann. § 77-2004. This in turn would lead to case-by-case litigation over whether that relation existed. *See, e.g., In re Estate of Straka*, 15 Neb.App. 796, 736 N.W.2d 406 (2007); *see also Hearst*, 461 N.W.2d at 306 ("[T]he State has a legitimate interest in maintaining administrative economy."). Out of these three possibilities, it was constitutionally permissible for the Iowa legislature to follow the second path.[2]

This determination is consistent with our most recent tax cases involving article I, section 6. In *RACI II*, we held that the general assembly's dramatically higher tax on gambling receipts at racetracks as opposed to gambling receipts at riverboats was unconstitutional. 675 N.W.2d at 16. We rejected seriatim, under article I, section 6, each of the supposed rational basis interests accepted by the United States Supreme Court for Fourteenth Amendment purposes. First, the alleged purpose to promote river communities was "illogical"—there were casinos on the rivers and a riverboat on a lake. *Id.* at 9–11. Nor could reliance interests justify the huge tax discrepancy. *Id.* at 11–12. Under the legislation, "the taxation lines are drawn ... regardless of the time of investment." *Id.* at 11. Finally, we rejected the alleged interest in aiding the financial position of riverboats, because this rationale was fundamentally circular. *Id.* at 12–13. Any classification in the tax laws always benefits the party on the right side of the classification. *Id.* at 13. There must be some ration-

---

**2.** As we reiterated in *Mitchell*, "[P]ractical problems of government permit rough accommodations." 757 N.W.2d at 437 (quoting *State v. Mann*, 602 N.W.2d 785, 792 (Iowa 1999)). "As long as the classificatory scheme chosen by [the legislature] rationally advances a reasonable and identifiable governmental objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred." *Id.* at 438 (alteration in original) (quoting *Sanchez*, 692 N.W.2d at 818).

al reason *for* favoring that party. *Id.* Here we noted that the legislative history actually *disproved* claims that casinos could absorb a higher tax rate or that a lower tax rate on gambling receipts at riverboats was designed as an incentive to keep them from moving to another state. *See id.* at 14 ("[T]he legislative history indicates otherwise."); *id.* at 15 ("[T]he legislative history belies that argument.").

The case before us differs from *RACI II*. In the present case, it is not illogical to conclude the tax classification furthers the objective of protecting and preserving families and family relationships. Additionally, the asserted government interest is not simply a restatement of the classification itself. Nor is the alleged government interest undermined by the actual legislative history. Indeed, the parties have stipulated that there is no legislative history for the Iowa Code section 450.1(1)(*e*) definition of stepchild. Although Paula and Mark made a narrow factual showing in this instance, the individualized circumstances in this case do not convince us that there is no factual basis for the legislature's general classification scheme.

Since *RACI II*, we have twice upheld tax classifications against article I, section 6 challenges. In *Qwest*, we sustained a personal property tax that fell only on the Iowa-based property of incumbent local exchange carriers (ILECs), and not on the Iowa-based property of competitive long-distance carriers (CLDCs) or wireless exchange carriers. 829 N.W.2d at 551. We reasoned that although ILECs and CLDCs provide comparable services, the legislature could rationally conclude that ILECs continue to have market dominance in wireline services, and that taxing ILECs but not CLDCs was a reasonable way to spur competition while capturing some of the ILECs' monopoly rents. *Id.* at 562–63. We further noted that the legisla-

ture could reasonably conclude wireless services already operated in a competitive industry and, to some extent, comprised a separate market from wireline services. *Id.* at 562–64. That being the case, the legislature could rationally conclude a tax on the property of wireless companies would not recover a monopoly rent but would simply be passed along to the consumer in the form of higher prices. *Id.* at 563–64. These considerations were sufficient for the classification to be upheld.

In *LSCP*, we overruled an article I, section 6 challenge to a state tax on interstate deliveries of natural gas to direct customers. 861 N.W.2d at 862. The tax varied based upon the customer's location within Iowa, it grandfathered as exempt preexisting direct customers, and for each of fifty-two geographic areas it effectively froze that area's overall tax liability from 1998. *Id.* at 852–53, 861. The taxpayer argued instead for a single statewide tax rate. *Id.* at 854. Nonetheless, we upheld the variable tax as a way to protect pre-1999 users from drastic change while possibly reducing the effect of tax costs on a new prospective direct customer's choice of location. *Id.* at 862.

*Qwest* and *LSCP* illustrate the inherent difficulty in drawing lines for taxation purposes. Having a single uniform rate may result in greater unfairness than having multiple rates. And eliminating one discrepancy because of perceived unfairness may lead to another. For example, if the child of a decedent's ex-spouse is constitutionally entitled to preferential inheritance tax treatment, why not a decedent's nephew, niece, or foster child?

In sum, we find a rational basis exists for the legislature to exclude stepchildren postdivorce from the inheritance tax exemption for surviving spouses, lineal descendants, lineal ascendants, and other stepchildren. Iowa Code section 450.1(1)(*e*)

therefore does not violate article I, section 6 of the Iowa Constitution.

## IV. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**